THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHICAGO REGIONAL COUNCIL OF CARPENTERS PENSION FUND, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | No. 19 C 2965 |
| v. | ) | |
| | ) | |
| DRIVE CONSTRUCTION, INC. & ACCURATE CONSTRUCTION, LLC, | ) | Judge Virginia M. Kendall |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

This case began over four years ago as a straightforward benefits-contribution suit. (Dkt. 1). But like the many-headed Lernaean Hydra,[1] it has since sprouted counterclaims, crossclaims, and third-party claims—not to mention myriad discovery motions. Plaintiffs (the "Trust Funds")[2] are multiemployer pension funds that receive contributions from employers under collective-bargaining agreements ("CBAs") between employers and the Chicago Regional Council of Carpenters, a labor union (the "Union"). (*See generally* dkts. 1, 29, 190). The Trust Funds sued Drive Construction, Inc., under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1132 *et seq.*, alleging that Drive failed to pay pension contributions as the governing CBAs require. (*See generally* dkts. 1, 29, 190).

---

[1] The Greek mythological hero Heracles faced this massive, multiheaded monster in the second of his twelve labors. When he cut off one of its serpentine heads, two more grew in its place. *See* Daniel Ogden, Drakōn: Dragon Myth and Serpent Cult in the Greek and Roman Worlds 26 (2013).

[2] Plaintiffs (or the "Trust Funds") include the Chicago Regional Council of Carpenters Pension Fund, the Chicago Regional Council of Carpenters Welfare Fund, the Regional Council of Carpenters Supplemental Retirement Fund, and the Chicago Regional Council of Carpenters Apprentice and Trainee Program. (Dkt. 190 ¶ 1).

After proceeding before the Hon. Charles Norgle, the case was reassigned to this Court upon Judge Norgle's retirement in October 2022. (Dkt. 136). The Court granted the Trust Funds leave to file a Second Amended Complaint ("SAC"), adding Accurate Construction, LLC, as a defendant. (Dkts. 188, 190). Drive answered, (dkt. 223 at 1–16 ¶¶ 1–48 ("Amended Answer")), and included in its filing a four-count Counterclaim against the Trust Funds, (dkt. 223 at 16–31 ¶¶ 1–74 ("Countercl.")).[3] Drive also brings a Third-Party Complaint against Accurate and two individuals: Jesus Cortez and Francisco Guel. (Dkt. 223 at 31–33 ¶¶ 1–12 ("TPC")).

Accurate moves to dismiss the Trust Funds' claim against it in the SAC. (Dkt. 260). The Trust Funds move to dismiss Drive's Counterclaims, (dkt. 228), and to strike the TPC, (dkt. 226).[4] Finally, Jesus Cortez moves to dismiss the claims against him in Drive's TPC. (Dkt. 271). For the following reasons, the Court denies Accurate's Motion to Dismiss the SAC. (Dkt. 260). The Court grants the Trust Funds' Motion to Dismiss the Counterclaims. (Dkt. 228). The Court adopts the Report and Recommendation of the Magistrate Judge, (dkt. 284), and grants the Trust Funds' Motion to Strike the TPC as to Accurate and Guel. (Dkt. 226). Finally, the Court grants Jesus Cortez's Motion to Dismiss the claim against him in the TPC. (Dkt. 271).

## BACKGROUND

### I.    Plaintiffs' Second Amended Complaint

The SAC adds Accurate as a defendant jointly and severally liable with Drive for unpaid pension contributions as an "alter ego and/or single employer." (Dkt. 190 ¶¶ 44–49). Plaintiffs

---

[3] Drive's Amended Answer, Counterclaim, and Third-Party Complaint are all included in the same filing, with each respective section starting over with renumbered paragraphs. (*See* dkt. 223). For clarity, the Court cites each section of the filing according to its abbreviated pleading title rather than the docket number.

[4] This Court expanded the referral to the Magistrate Judge to include ruling on the Trust Funds' Motion to Strike the TPC. (Dkt. 258). Defendant Accurate and Third-Party Defendant Francisco Guel have joined and adopted the Trust Funds' Motion to Strike the TPC. (Dkts. 234, 240, 241, 243).

allege that Drive controlled Accurate to perpetuate a cash-pay scheme and avoid its pension-contribution obligations under the governing CBAs. (Dkt. 190 ¶ 2).

The SAC centers on the dealings of three brothers—Gerardo, Eduardo, and Jesus Cortez. (Dkt. 190 ¶ 8). Gerardo and Eduardo Cortez are officers of Drive, and Jesus Cortez was employed by Drive. (*Id.* ¶ 9, 12). In 2014, Jesus Cortez formed Cortez-Accurate Construction LLC, also registered to do business under the name Accurate Construction, LLC. (*Id.* ¶ 10). It shared office space with Drive. (*Id.*) Cortez-Accurate Construction dissolved in 2015. (*Id.* ¶ 11). In 2016, Accurate Construction, LLC, was organized, with an individual named Kelly Byrne registered as its sole member. (*Id.*) Byrne had previously been Vice President of Cortez-Accurate. (*Id.*)

Plaintiffs essentially allege that Accurate was nothing but a paper company that the Cortez brothers controlled and treated as an alter ego of Drive in their construction business. (*See id.* ¶¶ 13–17). Specifically, Drive and Accurate commingled funds: over $2 million in checks made out to Drive were deposited into Accurate's bank account throughout 2018 and 2019. (*Id.* ¶ 14). Accurate routinely made payments to Eduardo Cortez, Jesus Cortez, and other Drive employees. (*Id.*) And Eduardo Cortez deposited money into Accurate's bank account. (*Id.*)

Additionally, Drive's agents regularly acted on Accurate's behalf "by submitting Accurate's certified payroll, lien waivers, requests for payments, and notarizing Accurate's documents that were sent to developers." (*Id.* ¶ 15). For example, Lydia Castro and Zeb Pajel—both Drive employees—submitted lien waivers for both Drive and Accurate. Pajel even submitted waivers for Accurate from his Drive email account and often received requests from developers to submit revised or corrected documents on Accurate's behalf. (*Id.*) Further, the two companies listed common carpenter employees—such as Raul Lovera—on their respective payrolls. (*Id.* ¶

16). Clients would reach out to Drive employees, including Jesus Cortez at his Drive email address, to request that Accurate submit project bids. (*Id.*)

Drive employees Francisco Guel, Raul Lovera, and Juan Carlos Lara also established other corporate entities ("Drive Agent Entities") that received millions of dollars in payments from Accurate, converted these payments into cash or money orders, and delivered these as wage payments to Drive's carpenters on Union jobs. (*See id.* ¶¶ 18–23). Drive thus used Accurate and Accurate's payments to the Drive Agent Entities to avoid its wage and benefit obligations. (*Id.* ¶ 21). Drive paid its Union carpenters in cash at rates below the CBAs' requirements and never reported to the Trust Funds these "off the books" hours paid in cash. (*Id.* ¶ 22).

Despite attempts to conceal Drive's relationship with Accurate, the details of this scheme came to light because of the Illinois Attorney General's independent investigation into Drive's payroll practices. (*See id.* ¶¶ 26–35). Newly discovered information showed millions of dollars in payments from Accurate to the Drive Agent Entities owned by Guel, Lovera, and Lara. (*Id.* ¶ 36). Additional discovery traced those payments through currency-exchange transactions that resulted in cash and money orders paid to Union members employed by Drive. (*Id.*) The Trust Funds' auditors then prepared a revised audit and found that Drive and Accurate together failed to submit $9,134,735.10 in contributions owed to the Trust Funds for the period of January 2016 through the present. (*Id.* ¶¶ 36–37).

## II. Drive Construction's Counterclaims Against the Trust Funds

Drive seeks to recover overpayments in benefits contributions to the Trust Funds for Union carpenters' time falsely reported to those Funds. (Countercl. ¶ 1). According to Drive, "Plaintiffs and their agents knew or should have known that such reporting was not a valid basis for making

contributions to the Trust Funds under ERISA and/or the terms of the various Trust Fund documents that must comply with ERISA." (*Id.*)

As Drive tells it, the parties' dispute began when Peter DiRaffaele, then a Union senior official and member of the Board of Trustees for the Trust Funds, met with Drive's President, Gerardo Cortez in 2018. (*Id.* ¶¶ 7–8). DiRaffaele claimed that Drive owed $80,000 for work that an individual—Eduardo Medina—had purportedly done for Drive as a journeyman carpenter in the Union. (*Id.* ¶¶ 8, 14–15). But Medina, who was the cousin of Raul Lovera, one of Drive's superintendents, had never been a journeyman carpenter. (*Id.* ¶¶ 12–15). Drive had asked the Union to admit Medina as an apprentice as a favor to Lovera, but "[s]omeone apparently thereafter modified the letter so that it falsely suggested that Drive was asking for Medina to become a journeyman member of the Union." (*Id.* ¶ 12). Drive then rejected Medina's application when he applied for work. (*Id.*) Yet Medina "inexplicably received a card as a journeyman carpenter without any testing simply by paying a fee to the Union." (*Id.* ¶ 13).

After Drive rejected his application, Medina nevertheless told the Union that he had been working for Drive as a journeyman carpenter, leading to DiRaffaele's and Gerardo Cortez's meeting. (*Id.* ¶ 14). Gerardo Cortez denied that Medina had ever worked for Drive as a journeyman carpenter and refused to pay $80,000. (*Id.* ¶ 15). "DiRaffaele then became enraged, abusive and threatened that he would cause Drive to be audited so badly that they will wish they had paid, and that he would make Cortez's life a 'living hell.'" (*Id.*)

Drive claims that the Union routinely—and improperly—designates unqualified individuals as journeyman carpenters. (*Id.* ¶ 22). Because of DiRaffaele's (and later, his successor's[5]) role in the Union and on the Trust Funds' Board, the Trust Funds knew or should

---

[5] DiRaffaele retired at an unspecified time, and an unnamed "successor assumed all" of DiRaffaele's roles. (Countercl. ¶ 7).

have known that Drive had overpaid its pension contributions due to misclassified journeyman carpenters. (*Id.* ¶¶ 23–24). Further, although the Trust Funds had recently audited Drive and found only minor deficiencies—with none due to any alleged cash payments to carpenters—after the meeting between DiRaffaele and Cortez, the Funds repeated the audit. (*Id.* ¶¶ 19–20).

In late 2018, "DiRaffaele and then his successor were instrumental in creating a special Task Force involving the Union, the Trust Funds, and the attorneys" representing these entities. (*Id.* ¶ 21). On paper, the Task Force was organized to investigate industry employers generally, but in practice, it targeted only Drive. (*Id.*) Moreover, DiRaffaele, his successor, the Union, and the Trust Funds "were instrumental in causing the Illinois Attorney General's Office to initiate an investigation regarding Drive's payroll practices." (*Id.* ¶ 25).

The Trust Funds' auditor prepared revised audit reports in September 2019 and January 2020, neither of which included deficiencies due to alleged cash payments to carpenters. (*Id.* ¶¶ 27–28). In May 2020, the auditor reduced the January 2020 audit by half, still without claiming deficiencies resulting from cash payments. (*Id.* ¶ 30). In June 2020, the auditor submitted yet another revised audit, to which Drive responded, but the Trust Funds never replied. (*Id.* ¶ 31). Finally, in April 2021, the Trust Funds submitted another revised audit—prepared not by its auditor, but by one of the Funds' employees—based upon claims of cash payments to Drive's employees. (*Id.* ¶ 34).

Meanwhile, the Trust Funds sought discovery on the cash-payment claims. (Countercl. ¶¶ 32–33). During this process, the Trust Funds and the Union "encourage[ed] Drive's Union carpenters to fabricate claims that Drive was paying its employees in cash," (*id.* ¶ 36), and "coerced carpenters into providing false or misleading statements about being paid in cash or money orders," (*id.* ¶ 37). Their coercion included threats that carpenters would be deported, expelled from the

6

Union, or fined, and that they would lose their homes and health insurance. (*Id.* ¶¶ 37–38). Further, Union officials on the Task Force "promised incentives to carpenters if they would support the false cash payments claims, including offers of up to $30,000 and the possibility of additional pension credits." (*Id.* ¶ 39).

Drive's carpenters only received cash payments for side projects and personal jobs that they took during the workday and falsely reported as hours worked on Drive's Union projects. (*Id.* ¶¶ 36, 43–46). Union stewards and Task Force members knew this, so the Trust Funds knew or should have known as well. (*Id.* ¶¶ 40–41, 43). Yet the Funds persisted with their claims that Drive improperly paid employees in cash to avoid its contribution obligations. (*Id.* ¶¶ 40–41, 43, 46–47). As a result of the mistaken and fraudulent reports of Union members' time worked from 2018 and 2019, the Trust Funds received hundreds of thousands of dollars from Drive for benefits contributions. (*Id.* ¶ 54). They kept the money even after learning the payments "had been made as a result of the false and fraudulent reports regarding time worked by carpenters." (*Id.* ¶ 54).

### III.    Drive Construction's Third-Party Complaint

Finally, in its Third-Party Complaint, Drive brings conversion claims against Accurate (its codefendant) and third-party defendants Jesus Cortez and Francisco Guel. (*See* dkt. 223 at 31–33 ¶¶ 1–12 ("TPC")). Jesus Cortez was an agent of Accurate and is the brother of Gerardo Cortez, Drive's owner. (TPC ¶ 5). Guel was also an agent of Accurate and a friend of the Cortez family. (TPC ¶ 6). Jesus Cortez, Guel, and others performed non-union jobs through Accurate, but they "often used Union carpenters to perform the work as side jobs and paid the carpenters in cash or money orders." (*Id.* ¶ 8). In 2018 and 2019, Guel "sometimes took checks from Drive's offices that had been made payable to Drive, without permission from anyone at Drive. Those checks were then endorsed to Accurate Construction and deposited into Accurate Construction's bank

accounts by [Jesus] Cortez." (*Id.* ¶ 9). At least thirty checks worth a cumulative $2,332,088.67 were deposited into Accurate's accounts. (*Id.* ¶ 12). Guel and Jesus Cortez intended to repay the money to Drive without Gerardo Cortez ever knowing, but they never did. (*Id.* ¶ 11).

## LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, the Court accepts all well-pleaded facts as true and "draw[s] all reasonable inferences in the [plaintiff's] favor." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 878 (7th Cir. 2022). The complaint's "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), must offer more than "labels and conclusions" or "a formulaic recitation of the elements." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a defendant's motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

## DISCUSSION

### I. Accurate's Motion to Dismiss the Second Amended Complaint

Count II of the SAC alleges that Accurate breached the governing CBAs between Drive and the Union by failing to submit pension-benefit contributions. Accurate moves to dismiss Count II—the only claim against it—arguing that it is not obligated to make contributions to the Trust Funds. Although Drive entered into CBAs with the Union, Accurate never did. The Trust Funds, however, allege that Accurate is alternatively a single employer with Drive or the alter ego of Drive. Under either doctrine, the terms of a collective-bargaining agreement will bind two entities even if only one entity entered it. *See Moriarty v. Svec*, 164 F.3d 323, 332 (7th Cir. 1998); *Trs. of Pension, Welfare & Vacation Fringe Benefits Funds of IBEW Loc. 701 v. Favia Elec. Co., Inc.*,

995 F.2d 785, 787 (7th Cir. 1993). Accurate maintains that the Trust Funds fail to sufficiently plead either theory.

### A.     Single-Employer Doctrine

Under ERISA § 515, "[e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall … make such contributions in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. When two entities are sufficiently integrated, ERISA treats them as a single employer. *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen, Dist. Council of Wis. & Its Loc. 5*, 724 F.3d 939, 946–47 (7th Cir. 2013) (citing *Moriarty*, 164 F.3d at 332). The single-employer analysis has four factors: "(1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership." *Cremation Soc'y of Ill., Inc. v. Int'l Bhd. of Teamsters Loc. 727*, 869 F.3d 610, 616 (7th Cir. 2017) (quoting *Lippert Tile*, 724 F.3d at 946). "No single factor is dispositive;" rather, the Court "must weigh the totality of the circumstances." *Id.* (citing *Lippert Tile*, 724 F.3d at 946–47). "Ultimately, single employer status is characterized by the absence of an arm's length relationship found among unintegrated companies." *Id.* (quoting *Lippert Tile*, 724 F.3d at 947).

First, "when analyzing the interrelation of operations, the 'day-to-day operational matters' are the most relevant." *Id.* (quoting *Lippert Tile*, 724 F.3d at 947). The Trust Funds have alleged several facts suggesting interrelated operations between Drive and Accurate. They shared office space. *See Cremation Soc'y of Ill.*, 869 F.3d at 616 (companies operated out of same building); *Lippert Tile*, 724 F.3d at 947 (discussing relevance of shared space where companies housed in same warehouse made shared supervision of both companies easier); *see also, e.g., Chi. Reg'l Council of Carpenters Pension Fund v. TMG Corp.*, 206 F. Supp. 3d 1351, 1357 (N.D. Ill. 2016)

(companies operated out of same office). Though they had separate bank accounts, Drive commingled its funds with Accurate. *Cf. TMG Corp.*, 206 F. Supp. 3d at 1357 (noting relevance of fact that two companies that had separate bank accounts at the same time at the same banks, even without commingling funds). And Drive's employees performed tasks and responded to client requests on behalf of both companies. *See, e.g.*, *Chi. Reg'l Council of Carpenters Pension Fund v. Carlson Constructors Corp.*, 2022 WL 874608, at *12 (N.D. Ill. Mar. 24, 2022) ("Defendants shared clerical staff such as the receptionist and controller…."); *Automobile Mechanics' Loc. No. 701 Union & Indus. Pension Fund v. Dynamic Garage, Inc.*, 2018 WL 4699842, at *5 (N.D. Ill. Sept. 30, 2018) (noting defendants used same clerical staff, and employees of one defendant performed administrative work for the other). These facts all suggest interrelatedness of operations.

Second, the common-management factor considers "actual or active control, as distinguished from potential control, over the other's day-to-day operations." *Cremation Soc'y of Ill.*, 869 F.3d at 617 (citing *Lippert Tile*, 724 F.3d at 947). Neither of Drive's officers—Eduardo Cortez and Gerardo Cortez—had formal titles at Accurate, and Jesus Cortez was only an employee of Drive. But the SAC alleges that in practice, both Eduardo Cortez and Jesus Cortez remained in control of Accurate until it was dissolved. Prospective Accurate clients reached out to Jesus Cortez at his Drive email account, suggesting both that he managed Accurate's day-to-day operations and that his management of Accurate projects was not separate from his role at Drive. Eduardo Cortez also regularly deposited money into Accurate's bank account. Details are sparse at this point in the litigation, but the allegations suggest some shared management between the two companies. *See Lippert Tile*, 724 F.3d at 947.

Third, the Court considers "who is responsible for hiring, firing and evaluating employees." *Cremation Soc'y of Ill., Inc.*, 869 F.3d at 617 (citing *Lippert Tile*, 724 F.3d at 947). The two companies had common administrative employees. Additionally, Accurate's certified payroll included some carpenter employees who were also on Drive's payroll. This overlap plausibly suggests centralized hiring control between the two companies, though the SAC does not discuss who was responsible for employment decisions at either company. Finally, the SAC has not alleged common ownership. This, however, is not dispositive. *See, e.g.*, *TMG Corp.*, 206 F. Supp. 3d at 1360 (concluding entities were single employer despite absence of evidence of common ownership).

Under the totality of the circumstances, the SAC plausibly alleges that Drive and Accurate did not operate at an arm's length relationship. The Trust Funds have pleaded sufficient facts to support a single-employer theory of liability against Accurate.

### B. Alter-Ego Doctrine

Alternatively, the Trust Funds assert that Accurate is the alter ego of Drive and thus bound by the CBA between Drive and the Union. To establish that one company is the alter ego of another, a plaintiff must show "the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets." *Favia Elec. Co.*, 995 F.2d at 789. "[U]nlawful motive or intent are critical inquiries in an alter ego analysis." *Id.* (quoting *Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312–13 (7th Cir. 1987)).

The SAC alleges several facts showing that Accurate existed as part of a scheme for Drive to avoid its pension-contribution obligations under the CBA. Drive agents received payments from Accurate and then converted these payments into cash and money orders to pay Drive's carpenters

11

off the books. This would constitute a "sham transfer of assets." *Id.* The activity, as alleged, also supports an inference that Drive and Accurate acted with the unlawful motive to avoid contributing to the Trust Funds. Further, Drive tried to conceal its relationship with Accurate during this litigation. Both Gerardo Cortez and Francisco Guel said in their depositions that they were not familiar with Accurate. (Dkt. 190 ¶¶ 30–32). It later came out in the Illinois Attorney General's investigation that Accurate had paid the company Guel owned. (*Id.* ¶ 35). This likewise implies deliberate obfuscation and bad faith, given allegations of the companies' interrelatedness. *See Cent. States, Se. & Sw. Areas Pension Fund v. Sloan*, 902 F.2d 593, 597–98 (7th Cir. 1990) (holding alter-ego theory of liability proven where there was an intent to avoid pension obligations and companies remained interrelated). At this stage the Trust Funds have plausibly alleged an alter-ego theory of liability.

In sum, the Trust Funds have stated a claim against Accurate for violating ERISA § 515 under alternative single-employer and alter-ego theories of liability. The Court thus denies Accurate's Motion to Dismiss. (Dkt. 260).

## II.    Trust Funds' Motion to Dismiss Drive's Counterclaims

Nearly four years into this litigation, Drive—for the first time—brings Counterclaims against the Trust Funds in its Answer (and Amended Answer) to the SAC. (Dkts. 213, 233). First, Drive claims that it exercised its rights under ERISA § 510 by objecting to the $80,000 demand for payment from DiRaffaele in 2018. (Countercl. ¶ 58). Then, by initiating this litigation, demanding multiple audits, and coercing Drive carpenters into making false statements about alleged cash payments, the Trust Funds discriminated against Drive for exercising its statutory rights. (*Id.* ¶¶ 59–60). Count I alleges that this discriminatory practice violates ERISA § 510, 29 U.S.C. § 1140. (*Id.* ¶¶ 2, 55–56, 60). Count II seeks damages under ERISA § 4301(a)(1), 29 U.S.C.

§ 1451(a), for the Trust Funds' acts that harmed Drive. (*Id.* ¶¶ 63–67). Count III alleges unjust enrichment. (*Id.* ¶ 69). And Count IV seeks a declaratory judgment that: "Drive is not responsible for contributions to the Trust Funds for work that its carpenter employees performed for other persons and entities, and is not responsible for contributions to the Trust Funds for contributions at the journeyman rate where the worker was not qualified as a journeyman." (*Id.* ¶¶ 71–74).

### A.    Count I: ERISA § 510

ERISA § 510 protects employees from an employer's interference with receiving their plan benefits.[6] *See* 29 U.S.C. § 1140; *see also Teamsters Loc. Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 823 (7th Cir. 2014) ("Section 510 makes it unlawful to take certain adverse actions against the participants in an employee benefits plan for the purpose of interfering with their attainment of benefits under the plan."). Typically, actions brought under § 510 involve the employment relationship between plan employers and individual employees. *See id.*; *see also Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998) ("In enacting section 510, Congress' primary aim was to prevent unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights or other benefits." (internal

---

[6] The full text of the statute states:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pensions Plan Disclosure Act. It shall be unlawful for any person to discharge, fine, suspend, expel, or discriminate against any person because he has given information or has testified or is about to testify in any inquiry or proceeding relating to this chapter or the Welfare and Pension Plans Disclosure Act. In the case of a multiemployer plan, it shall be unlawful for the plan sponsor or any other person to discriminate against any contributing employer for exercising rights under this chapter or for giving information or testifying in any inquiry or proceeding relating to this chapter before Congress. The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

ERISA § 510, 29 U.S.C. § 1140.

citations omitted)). But "[b]y its terms, § 510 does not condition liability on the existence of an employment relationship." *Burlington N. Santa Fe, LLC*, 741 F.3d at 827.

> Drive here focuses on the last two sentences of this section of the statute:

> In the case of a multiemployer plan, it shall be unlawful for the plan sponsor or any other person to discriminate against any contributing employer for exercising rights under this chapter or for giving information or testifying in any inquiry or proceeding relating to this chapter before Congress. The provisions of section 1132 of this title shall be applicable in the enforcement of this section.

ERISA § 510, 29 U.S.C. § 1140. Private enforcement of ERISA § 510 thus falls under ERISA § 502, the statute's comprehensive civil-enforcement scheme. 29 U.S.C. § 1132. In relevant part, that section authorizes a private right of action to be brought—

> in the case of a multiemployer plan, by … any employer that has an obligation to contribute under the plan, (A) to enjoin any act or practice which violates subsection (k) of section 1021 of this title (or, in the case of an employer, subsection (*l*) of such section), or (B) to obtain appropriate equitable relief (i) to redress such violation or (ii) to enforce such subsection.

ERISA § 502(a)(11), 29 U.S.C. § 1132(a)(11).[7] Finally, ERISA § 101(*l*), 29 U.S.C. § 1021(*l*) as referenced in ERISA § 502(a)(11), gives employers the right to request in writing from multiemployer plans an annual notice of the employer's calculated withdrawal liability. *See* 29 U.S.C. § 1021(*l*).

The Trust Funds are a multiemployer plan, and Drive is an employer with an obligation to contribute under the plan. But Drive has no standing to enforce ERISA § 510 here. Drive has alleged no violation by the Trust Funds of ERISA § 101(*l*) as § 502(a)(11) provides for an employer's private civil enforcement. Section 502(a)(11) permits employers to enjoin a

---

[7] ERISA § 502(a) provides a private right of action for employers to bring claims against multiemployer pension plans under only two other circumstances. First, an employer may seek to enjoin a violation of 29 U.S.C. § 1021(f), which in turn requires multiemployer plans to provide employers with an annual plan funding notice, including the plan's funded percentage, value of plan assets, and other information. ERISA § 502(a)(8), 29 U.S.C. § 1132(a)(8). Second, an employer may seek a court order regarding a funding-improvement or rehabilitation plan when an actuary has certified that a multiemployer plan is in endangered or critical status. ERISA § 502(a)(10), 29 U.S.C. § 1132(a)(10). Neither situation applies here.

multiemployer plan's practice that violates ERISA § 101(*l*)'s disclosure requirements regarding an employer's withdrawal liability and to seek appropriate equitable relief to redress such a violation. *See* 29 U.S.C. §§ 1132(a)(11), 1021(*l*). Drive never sought notice of its withdrawal liability from the Trust Funds, much less claimed that any such notice violated the Trust Funds' disclosure obligations to employers under § 1021(*l*).

Drive's Counterclaim makes only conclusory assertions that Drive "exercised its rights under ERISA § 510," (Countercl. ¶ 58), or was "exercising its rights under the Act," (Countercl. ¶¶ 59–60), when Gerardo Cortez refused to pay $80,000 on DiRaffaele's demand at their 2018 meeting. Drive's only attempt to locate its purported statutory right appears in its response to the Motion to Dismiss. Drive argues that the Trust Fund "is violating the employer's rights to have an accurate estimate of its withdrawal liability available on a yearly basis under ERISA § 101(*l*)." (Dkt. 238 at 11; *see also id.* at 11–12 ("Employers do not have many rights under ERISA, but they do have a right to an accurate estimate of withdrawal liability ….")). But Gerardo Cortez's objection to DiRaffaele's demand for $80,000 in a meeting has nothing to do with Drive's right to request annual notice, in writing, of its withdrawal liability from the Trust Funds. And neither § 510 nor § 502(a) vindicates any purported right of an employer to object to a union official's unfounded demand for payment.[8] Moreover, Drive *has never requested* notice of its withdrawal liability. Drive's claim under ERISA § 510 in Count I is not viable because it exercised no rights under ERISA.

---

[8] The Counterclaim does not even make clear on what authority DiRaffaele demanded an $80,000 payment, what it was for, and to whom it should be made. (*See* Countercl. ¶ 15). It appears that DiRaffaele was acting in his capacity as "employed by the Carpenters Union as a senior official," though he also "served on the Boards of Directors of the Trust Funds," too. (*Id.* ¶ 7). Nowhere does Drive allege that DiRaffaele was acting as the Trust Funds' agent in demanding unpaid benefit contributions. Nor even that he ever had authority to act on the Trust Funds' behalf in that way. Although Drive boldly declares that DiRaffaele "obviously had singular influence over the Plaintiffs' actions," and had "broad powers to influence the Funds' decisions," (dkt. 238 at 4–5), Drive never alleges that DiRaffaele's demand was connected to any authority—actual or apparent—he had to collect unpaid pension contributions for the Trust Funds.

B. **Count II: ERISA § 4301(a)(1)**

ERISA § 4301(a)(1) provides: "A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan, … may bring an action for appropriate legal or equitable relief, or both." 29 U.S.C. § 1451(a)(1). Drive claims in Count II that the Trust Funds have harmed it by accepting and retaining pension-benefit contributions from Drive that the Trust Funds knew to be improper. Drive seeks an award of "the amount of money Drive improperly paid to the Funds for contributions relating to time that had been reported but had not actually been worked, as well as Drive's attorneys' fees incurred in this action…." (Countercl. ¶ 67).

First, like in Count I, Drive misapplies the statute's scope here. It is not a boundless remedial device for anything an employer believes that a multiemployer pension fund has done wrong. Rather, this section vindicates harms caused by an "act or omission" undertaken pursuant to "this subtitle"—Subtitle E- Special Provisions for Multiemployer Plans, which codifies the Multiemployer Pension Plan Amendments Act (MPPAA) of 1980, 29 U.S.C. §§ 1381 *et seq.* The MPPAA allows multiemployer pension funds to assess withdrawal liability when an employer withdraws from a pension plan. It is designed to keep the fund solvent. *See* 29 U.S.C. § 1381; *see also Loc. 705 Int'l Bhd. of Teamsters Pension Fund v. Pitello*, 3 F.4th 949, 950 (7th Cir. 2021) (discussing congressional policy behind MPPAA). Thus, ERISA § 4301(a)(1) confers standing on an employer, for example, to seek return of withdrawal-liability payments wrongfully assessed against it under the MPPAA. 29 U.S.C. § 1451(a)(1). This subtitle of ERISA does not concern an employer's obligation to contribute to a pension fund pursuant to a CBA. Withdrawal liability

assessed against an employer under the MPPAA is distinct from contributions obligated by CBAs. *See* 29 U.S.C. § 1392.[9] No withdrawal-liability assessments are at issue here.

The MPPAA does not permit an employer to challenge the validity of past benefit contributions made under CBAs. Yet Drive seeks to do just that: it alleges that it overpaid the Trust Funds with contributions made years ago and wants its money back. Drive attempts to square this circle by asserting that "Drive has an absolute right under ERISA to seek an estimate of its withdrawal liability." (Dkt. 238 at 12). Drive urges that, if the Trust Funds continue to count the fraudulently obtained contributions, then the Funds' calculation of Drive's withdrawal liability will be artificially inflated. This is a red herring. Drive has never alleged that it has requested an estimate of its withdrawal liability from the Trust Funds. Some hypothetical future estimate of withdrawal liability has not "adversely affected" Drive, so it has no standing under ERISA § 4301(a)(1) to seek repayment of benefit contributions. 29 U.S.C. § 1451(a)(1) ("[an] employer . . . who is adversely affected by the act or omission of any party under this subtitle . . . may bring an action").

Second, Drive's claim is simply implausible. Drive weaves a speculative, conspiratorial narrative that attempts to tie the Trust Funds' alleged liability for Drive's own overpayments to widespread Union corruption and abuse of power. According to Drive, the Union intentionally misclassified workers so that Drive paid more in benefits to the Trust Funds. Further, Union stewards lied on timesheets about the hours that Drive's carpenters worked. The Trust Funds somehow knew or should have known about both these fraudulent Union schemes. Then, they

---

[9] (a) For the purposes of this part, the term "obligation to contribute" means an obligation to contribute arising—
    (1) under one or more collective bargaining (or related) agreements, or
    (2) as a result of a duty under applicable labor-management relations law, but
  does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions.
 (b) Payments of withdrawal liability under this part shall not be considered contributions for purposes of this part.

29 U.S.C. § 1392.

17

knew or should have known that this Union corruption caused Drive to overpay its benefits contributions. That the Trust Funds knew about the Union's misdeeds—and Drive's overpayments—but did nothing about it constitutes the purported "act or omission" that "adversely affected" Drive.

But Drive alleges only one connection between the Union and the Trust Funds: Peter DiRaffaele, who was once a Union senior official and also served on the Board of Directors of the Trust Funds and retired at some unspecified time.[10] DiRaffaele purportedly knew about one misclassified carpenter after Gerardo Cortez "presented objective evidence" in the 2018 meeting to prove that Medina was not a journeyman. (Countercl. ¶ 15). Drive then points to this singular example to claim that such misclassification was a "usual, customary and common practice by the Union."[11] (*Id.* ¶ 22). The Court is supposed to infer that DiRaffaele, as a Union senior official, was aware of this purportedly common Union practice. Further, the Court is to then infer that DiRaffaele—as a trustee for the Trust Funds—communicated his knowledge of this Union practice to the Trust Funds, a separate entity from the Union. (*See id.* ¶ 23). Drive seeks to impute any knowledge that DiRaffaele had (before his retirement) about Union practices to the Trust Funds, but Drive has no basis for doing so beyond speculation. Additionally, the Court must infer that the Trust Funds not only knew that this practice existed, but also that it affected Drive, such that Drive was overpaying its benefits contributions for multiple misclassified carpenters and had been for years. (*See id.*) Such a chain of imputed knowledge and inferences is too tenuous to be plausible.

---

[10] The Trust Funds point to deposition testimony showing that DiRaffaele was never a trustee for the Trust Funds. (Dkt. 228 at 8). But on a motion to dismiss, the Court assumes the truth of the nonmoving party's alleged facts. *Levy v. W. Coast Life Ins. Co.*, 44 F.4th 621, 627 (7th Cir. 2022).

[11] Drive also mentions one other supposed instance of this purportedly widespread practice: "For example, Drive was required to pay wages and contribution at the journeyman level to Ricardo Sanchez, even though the Mr. Santiago [sic] was never tested before being given that designation, and he received the designation at the age of about nineteen (19) despite the fact that the apprenticeship program for carpenters was supposed to be four years long." (Countercl. ¶ 22). But this allegation is not plausible as an example because it is not clear to whom Drive is referring.

Additionally, Drive cites the Union stewards' role on job sites to show that the Trust Funds "knew or should have known that the claims of cash payments for work on Drive projects was not true." (Countercl. ¶ 40). But there is no explanation for how the Trust Funds would know what happens on job sites. Union stewards are not associated with the Trust Funds. Finally, the Trust Funds were also supposedly aware of certain Union members conspiring to work on personal projects off-the-books while claiming those hours on Drive's payroll, because Drive gave the Trust Funds proof of this. (*Id.* ¶¶ 45–47). Drive then claims that the Trust Funds "ignored" this proof. (*Id.* ¶ 47). But it is unclear how any mistaken overpayments by Drive—even if the Trust Funds knew about them—constitute an *act* of the Trust Funds that harmed Drive. The Trust Funds did not cause the alleged misdeeds of the Union or its members. Nor did the Trust Funds cause Drive to overestimate its benefits contributions due under the governing CBAs. The Trust Funds had no reason to pull back from their own investigation of unpaid benefits contributions solely because Drive discovered some of its own workers were conspiring with the Union to cheat Drive.

In sum, Drive cannot assert a claim against the Trust Funds for overpaid pension contributions pursuant to ERISA § 4301(a)(1), 29 U.S.C. § 1451(a)(1). It has no standing to do so, and even if it did, Drive fails to state a plausible claim for relief.

### C. Count III: Unjust Enrichment

Count III contends that the Trust Funds have been unjustly enriched by the pension contributions that Drive paid for time that was not worked. (Countercl. ¶ 69). Unjust enrichment typically sounds in state law. *See Lindquist Ford, Inc. v. Middleton Motors, Inc.*, 658 F.3d 760, 766–67 (7th Cir. 2011) (discussing elements of unjust enrichment under Wisconsin law); *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (discussing Illinois unjust-enrichment claims). ERISA § 514(a) preempts state-law claims relating to employee benefit plans. 29 U.S.C.

§ 1144(a); *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004) ("[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore preempted."). When the existence of a pension plan is a critical factor to establishing liability under state law, the cause of action relates to an ERISA plan and is preempted. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139–40 (1990). Such is the case here. The existence of the Trust Funds—an ERISA pension plan—is critical to Drive's theory of liability—that the Trust Funds received and wrongfully retained pension benefits contributions. An unjust-enrichment theory of liability under any state's law would thus be preempted.

Drive, however, seeks a remedy under federal common law. (Dkt. 238 at 13). "Courts may develop such a federal common law only where ERISA itself 'does not expressly address the issue before the court.'" *Thomason v. Aetna Life Ins. Co.*, 9 F.3d 645, 647 (7th Cir. 1993) (quoting *Nachwalter v. Christie*, 805 F.2d 956, 959 (11th Cir. 1986)). "Where the statute is silent, courts must construct a common law that effectuates the policies underlying ERISA." *Id.* (citing *Black v. TIC Investment Corp.*, 900 F.2d 112, 114 (7th Cir. 1990)).

Drive seeks a refund of overpayment in pension contributions to the Trust Funds in 2018 and 2019, and ERISA does not expressly address this situation. In some situations, employers may seek recovery of mistakenly made benefits contributions under a federal common-law theory of unjust enrichment, with restitution as the appropriate equitable remedy. *UIU Severance Pay Tr. Fund v. Loc. Union No. 18-U, United Steelworkers of Am.*, 998 F.2d 509, 513 (7th Cir. 1993). *See also Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Pathology Lab'ys*, 71 F.3d 1251, 1254 (7th Cir. 1995) ("[R]estitution is a device to avoid unjust enrichment." (citing Restatement (First) of Restitution § 1 (Am. L. Inst. 1937))). The Court observed:

> ERISA *permits* plan trustees to return to employers payments made to a plan which are the result of a mistake of law or fact, 29 U.S.C. § 1103(c)(2)(A)(i) & (ii), but it does not establish a cause of action by which employers may seek to *compel* such a refund. Absent a judicially-crafted cause of action, employers are left to the mercy of plan trustees who have no financial incentive to return mistaken payments. Employers are already penalized for failing to make required contributions. 29 U.S.C. § 1132(g)(2). If they are not permitted to seek recovery of mistaken contributions they may be less inclined to sponsor ERISA-qualified plans at all. This would undermine ERISA's goal of expanding pension and welfare benefit plan coverage.

*UIU Severance Fund*, 998 F.2d at 513–14. *See also Constr. Indus. Ret. Fund of Rockford v. Kasper Trucking, Inc.*, 10 F.3d 465, 467 (7th Cir. 1993) ("[W]e held in *UIU Severance Pay Trust Fund v. Steelworkers Local Union No. 18-U*, 998 F.2d 509 (7th Cir. 1993), that ERISA lets courts establish federal common law governing restitution of mistaken payments."); *Buckley v. Dement, Inc. v. Travelers Plan Adm'rs of Ill., Inc.*, 39 F.3d 784, 790 (7th Cir. 1994) (noting that *UIU Severance Fund* approved remedy in restitution for an employer's mistaken contribution payments).

"[B]ecause the cause of action … is equitable in nature, recovery will not automatically follow upon a showing that the [employer] contributed more than was required but only if 'the equities favor it.'" *Kasper Trucking*, 10 F.3d at 467 (quoting *UIU Severance Fund*, 998 F.2d at 513). Weighing the equities involves considering such factors as: (1) whether the overpayments are "the sort of mistaken payments that equity demands be refunded," (2) whether the payor has delayed bringing the action for so long that laches applies, (3) whether the payor has ratified past payments "by continuing payments for years without apparent question," and (4) whether the payee would be unjustly enriched if recovery were denied. *UIU Severance Fund*, 998 F.2 at 513.

Weighing these factors shows that the equities do not favor restitution here, even if Drive mistakenly overpaid the Trust Funds for benefits contributions in 2018 and 2019. The first factor favors Drive. As alleged, the mistaken payments were made because Drive's own employees (aided by Union stewards) fraudulently reported hours worked on Drive projects. Pension benefits

are a form of deferred compensation to employees for their labor. *See Kasper Trucking*, 10 F.3d at 469. But if the employees did not work for Drive as reported, then Drive owed them no compensation, deferred or otherwise, for these hours. Likewise, if Drive paid its carpenters at journeyman-level rates that they were not entitled to, then their benefits contributions do not reflect their proper compensation. "Restitution is inequitable where a payor 'obtained a benefit that he intends to retain from the payment' made, but now seeks to have the payment returned." *Greater St. Louis Constr. Laborers Welfare Fund v. Park-Mark, Inc.*, 700 F.3d 1130, 1136 (8th Cir. 2012) (quoting *Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Const. Corp.*, 258 F.3d 645, 651 (7th Cir. 2001)). But Drive obtained no benefit from paying its employees deferred compensation that they did not earn.

The remaining factors, however, weigh against restitution. "The second factor to consider is if an equitable defense exists due to a delay in bringing the claim." *Park-Mark, Inc.*, 700 F.3d at 1136 (citing *UIU Severance Fund*, 998 F.2d at 513). The doctrine of laches "applies when the plaintiff has waited for an unreasonable length of time to assert his claim and the defendant has been prejudiced by the delay." *Horbach v. Kaczmarek*, 288 F.3d 969, 973 (7th Cir. 2002). "The doctrine is grounded in the equitable notion that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party." *Id.* (quoting *Tully v. State*, 574 N.E.2d 659, 662 (Ill. 1991).

Here, Drive had notice of the alleged overpayments to misclassified journeyman carpenters as early as 2018 when Gerardo Cortez met with DiRaffaele. It has now been litigating with the Trust Funds since May 2019. Yet Drive waited years to advance its claims for overpayments. Drive did not assert its claims against the Trust Funds until after the SAC was filed, nearly four years into the litigation. This delay is not reasonable. Further, the delay has prejudiced the Trust Funds.

Drive has given no approximation of how much they mistakenly paid in 2018 and 2019, nor identified which employees (or even how many) were overpaid. *Cf. Park-Mark, Inc.*, 700 F.3d at 1137 (employers' delay prejudiced pension fund by placing it in position of "attempting to unwind" several years of payments by trying to calculate whether employees validly received benefits from payments). The Trust Funds, moreover, depend on the stability of benefits contributions to remain solvent. Exposing the Trust Funds to a refund of an unknown amount of liability from several years ago could jeopardize its ability to meet its current pension obligations.

Third, "a refund may be inequitable if a company's continued, unquestioned payment over a period of years ratified the previous payments." *Park-Mark, Inc.*, 700 F.3d at 1137 (citing *UIU Severance Fund*, 998 F.2d at 513). Drive paid the same rates for its employees for years without raising concerns about mistaken or fraudulent payments. Even after the dispute in 2018 over Medina's status as a journeyman, Drive ostensibly did nothing to investigate his or any other carpenter's proper status and make any adjustments to its contribution payments. And fourth, "equity may favor a repayment if the Funds were unjustly enriched by [the employer]." *Id.* (citing *UIU Severance Fund*, 998 F.2d at 513). The Trust Funds are not the beneficiaries of pension benefits; Drive's employees are. *See Park-Mark, Inc.*, 700 F.3d at 1136 (noting overpayments are tied to higher pension and welfare benefits for employees). Drive has not shown that the Trust Funds were unjustly enriched by receiving funds held in trust for Drive's employees.

Although federal common law in the ERISA context provides a remedy in restitution for mistaken overpayments of benefits contributions, the equities do not favor such a remedy here. Drive cannot maintain its unjust-enrichment claim.

### D.    Count IV: Declaratory Judgment

Finally, Drive seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 regarding its obligation to pay contributions to the Trust Funds for work claimed by some of its employees and the rates at which it pays contributions for workers at different experience levels. (Countercl. ¶¶ 73–74). "The Declaratory Judgment Act empowers federal courts to give declaratory judgments in a case of actual controversy within its jurisdiction, but it is not an independent grant of jurisdiction, rather jurisdiction must be predicated on some other statute." *Rueth v. EPA*, 13 F.3d 227, 231 (7th Cir. 1993) (internal quotations omitted).

Drive does not identify which statutory provision of ERISA provides jurisdiction for its declaratory-judgment claim. The only potentially relevant statutory provision, ERISA § 503(a)(11), provides jurisdiction over an employer's action "to obtain appropriate equitable relief" to redress a multiemployer plan's violation of 29 U.S.C. § 1021(k) or § 1021(*l*). *See* 29 U.S.C. § 1132(a)(11); *cf. Newell Operating Co. v. Int'l Union of United Auto., Aerospace, & Agr. Implement Workers of Am.*, 532 F.3d 583, 587 (7th Cir. 2008), *overruled on other grounds* (declaratory action appropriate when ERISA § 502(a)(3) provides jurisdiction over equitable claims brought by fiduciary of ERISA plan to enforce ERISA provisions or terms of ERISA plan). The first provision addresses multiemployer pension plans' disclosure requirements. *See* 29 U.S.C. § 1021(k). The second addresses plans' obligation to give notice of withdrawal liability on request. *See* 29 U.S.C. § 1021(*l*). Neither provides grounds for the declaration Drive seeks.

ERISA provides no statutory basis for the Court to enter a declaration as to Drive's contribution obligations under the governing CBAs. The Court therefore lacks subject-matter jurisdiction over such a claim. Drive fails to state a claim in Count IV.

### III.    Plaintiffs' Motion to Strike

The Trust Funds' SAC named Accurate as a codefendant jointly and severally liable with Drive for $9,134,735.10 in contributions owed to the Trust Funds for the period of January 2016 through the present. (*See* dkt. 190). Drive then filed a "Third-Party Complaint" naming Accurate, Francisco Guel, and Jesus Cortez as third-party defendants. (*See* dkt. 223 at 31–33 ¶¶ 1–12). The Trust Funds moved to strike the TPC under Rule 14(a)(4), which permits any party to move to strike third-party claims. (Dkt. 226). Accurate and Guel joined and adopted the Trust Funds' Motion. (*See* dkts. 234, 240, 241, 243).

On April 17, 2023, this Court expanded its referral to the Magistrate Judge to include ruling on the Motion to Strike. (Dkt. 258); 28 U.S.C. § 636(b)(1)(A). The Magistrate Judge issued a Report and Recommendation on June 30, 2023. (Dkt. 284).[12] The Court adopts the Report and Recommendation in its entirety and grants the Trust Funds' Motion to Strike the TPC as to Accurate and Guel. (Dkt. 226).

### IV.    Cortez's Motion to Dismiss the Third-Party Complaint

Finally, Cortez moves to dismiss Drive's claims against him in the TPC for conversion. (Dkt. 271). He argues (1) that the TPC fails to allege secondary liability to properly implead a third party and (2) that the TPC fails to state a claim for conversion. (*Id.*)

Federal Rule of Civil Procedure 14(a) provides that "[a] defending party may, as third-party plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part of the claim against it." Fed. R. Civ. P. 14(a). "For a third-party plaintiff to properly implead a third-party defendant, the third-party defendant must be secondarily liable to the third-party plaintiff." *Wells Fargo Bank Minn., N.A. v. Johnston*, 2018 WL 11369065, at *2 (citing *U.S. Gen.,*

---

[12] The Court gave Drive fourteen days to file objections to the Magistrate Judge's Report and Recommendation. (Dkt. 284). That period expired on July 15, 2023, and Drive filed no objections.

*Inc. v. City of Joliet*, 598 F.2d 1050, 1053 (7th Cir. 1979)). *See also* 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1446 (3d ed. Apr. 2023 update) ("The crucial characteristic of a Rule 14 claim is that defendant is attempting to transfer to the third-party defendant the liability asserted against the defendant by the original plaintiff. The mere fact that the alleged third-party claim arises from the same transaction or set of facts as the original claim is not enough.").

Drive's conversion claim against Cortez—like its claim against Guel—fails to plead Cortez's secondary liability for unpaid pension contributions that Drive may owe the Trust Funds. Even if Cortez endorsed and deposited Drive's stolen checks into Accurate's account without authorization, this does not change Drive's obligation to contribute to the Trust Funds under the governing CBAs. And Cortez does not become secondarily liable to the Trust Funds for Drive's unpaid pension contributions simply because he took money from Drive to pay Accurate's non-union workers for side projects. A robber who steals cash from a home does not become liable to the homeowner's bank for taking money earmarked to pay the mortgage. The alleged act of conversion here has no relation to the Trust Fund's underlying claim against Drive for unpaid pension benefits contributions. Thus, the conversion claim against Cortez is improper under Rule 14 and must be dismissed.

## CONCLUSION

For these reasons, the Court denies Accurate's Motion to Dismiss Count II of the Second Amended Complaint. [260] The Court grants the Trust Funds' Motion to Dismiss Drive's Counterclaims. [228] The Counterclaims are dismissed without prejudice, and Drive may file an amended counterclaim by August 15, 2023. The Court further adopts the Report and Recommendation of the Magistrate Judge and grants the Trust Funds' Motion to Strike Drive's

Third-Party Complaint as to Accurate and Guel. [226, 284] The Court also grants Jesus Cortez's Motion to dismiss the claim against him in Drive's Third-Party Complaint. [271] The Third-Party Complaint is dismissed without prejudice, and Drive may file an amended third-party complaint by August 15, 2023.


_____
Virginia M. Kendall
United States District Judge

Date: July 26, 2023